# Exhibit 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: § <br> § <br> **IRON HORSE CHEMICALS, LLC** § <br> § <br> Debtor. § <br> § | **Case No. 25-90304** <br><br><br><br> **Chapter 11** |

**DECLARATION OF DARRYL WIEBE IN SUPPORT OF**
**THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Darryl Wiebe, hereby submit this declaration (this "Declaration") under penalty of perjury:

1. I am the Chief Executive Officer ("CEO") of Iron Horse Chemicals, LLC ("IHC" or the "Debtor"), a limited liability company organized under the laws of the State of Wyoming and the above referenced debtor-in-possession.

2. I am generally familiar with the Debtor's day-to-day operations, assets, financial affairs, contracts, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations, assets, and finances; information learned from my review of relevant documents; information supplied to me by other members of the Debtor's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtor's operations, financial condition, and the industry generally. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would competently testify to the facts set forth herein.

3. On August 12th, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11, title 11 of the United States Code, 11 U.S.C. §§

101 *et seq*. (as amended and modified, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). To minimize the adverse effects on its business, the Debtor has filed motions seeking various types of "first day" relief (the "First Day Motions") to allow the Debtor to meet its obligations and fulfill its duties as debtor in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value. I further believe that the relief sought in each First Day Motion constitutes a critical element in moving towards a successful restructuring of the Debtor's financial affairs, and best serves the Debtor's estate and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference.

## I.  COMPANY OVERVIEW

**A.      General Background**

4.      The Debtor is a leading manufacturer of industrial chemicals and specialty materials with a primary focus on the oil and gas industry. With offices in Midland, Texas, and facilities spread across multiple locations, coupled with a dedicated logistics team, the Debtor is able to deliver products on time and efficiently to customers worldwide. Formed in 2021, the Debtor has built a reputation for providing high-quality products and excellent customer service, staffed with a team composed of experts in the field who work closely with customers to understand their needs and provide solutions that meet or exceed expectations. Committed to staying on the cutting edge of technology, the Debtor's team is constantly researching and developing new products to better serve it's customers, providing innovative solutions to meet their customers' unique needs.

2

B.  **Prepetition Debt**

5. The Debtor has incurred a marginal amount of debt in recent years to fund their activities and sustain operations, as set forth below.

*Factoring Debt*

6. To accommodate the Debtor's then growing business and the addition of two significantly larger customer accounts with delayed payment terms, on or about June 26, 2023, the Debtor entered into a factoring arrangement with Bison Payments, LLC (the "Factoring Debt"). While the financing agreement is titled "Quick Pay Agreement," (hereafter, the "QPA") the arrangement with Bison Payments, LLC ("Bison"), is at best, a factoring agreement whereby Bison agreed to finance certain invoices of the Debtor in exchange for a lien on the Debtor's accounts receivable related thereto. While the total amount of Factoring Debt is a hotly contested issue, Bison purports to be owed in excess of $6 million as of the Petition Date.

*Unsecured Debt*

7. In addition to the prepetition Factoring Debt, the Debtor has unsecured debt owed to several trade creditors, vendors, equipment lessors, facility lessors, and others. In the ordinary course of business, the Debtor has engaged in numerous strategic relationships with various service providers in relation to their operations which are critical to maintaining the value of the Debtor's estate. Due to the various liquidity issues described below, the Debtor does not have sufficient cash flow to pay the trade payables. The Debtor estimates that they have incurred approximately $1.9 million in unsecured trade debt as of the Petition Date.

C.  **Events Leading to Chapter 11 Case**

8. While Debtor's management has worked diligently to lower their fixed monthly cost and right-size the business, the Factoring Debt, and Bison's maligned actions in both assessing

3

fees and interest, while refusing to negotiate in good faith and aggressively pursuing the Debtor's customers in their collection efforts, have effectively shuttered the Debtor's monthly revenue and stymied the Debtor from continuing to operate its business in the ordinary course. What was once a fairly collegial, working relationship with Bison, has quickly soured in May 2025, when Bison recognized the mistakes contained within the QPA, and insisted that the parties come to terms on a new revised agreement. Rather than negotiate in good faith, Bison has since terminated any additional funding while ramping up their collection efforts in an attempt to strangle the Debtor into submission, without even so much as providing an account of how the fees and interest were calculated under the QPA.

9. In preparation for filing this Chapter 11 Case, the Debtor has worked diligently to maintain the value of its assets, conserve its remaining cash, retain its work force and fund trade payables. Through this Chapter 11 Case, the Debtor seeks the protection of the automatic stay while they endeavor to effectuate the transactions needed to reorganize their financial affairs and maximize the value for all creditors and parties in interest.

## II.   FIRST DAY MOTIONS

10. Below is an overview of certain First Day Motions filed in conjunction with this Declaration. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtor into the Chapter 11 Case and minimize disruptions to the Debtor's business operations. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

A.    **Debtor's Emergency Motion For Entry Of An Order Extending The Time To File (I) Schedule of Assets and Liabilities, (II) Schedule of Current Income and Expenditures, (III) Schedule of Executory Contracts and Unexpired Leases, and (IV) Statement of Financial Affairs ("<u>Schedules Motion</u>")**

11.    In the Schedules Motion [ECF # 7] the Debtor seeks entry of an order: (i) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedule of current income and expenditures, schedule of executory contracts and unexpired leases, and statement of financial affairs (collectively, the "<u>Schedules and Statement</u>") by an additional twenty-one (21) days, for a total of thirty-five (35) days from the Petition Date, through and including September 16, 2025.

12.    The Debtor has spent, and continues to spend, a substantial amount of time ensuring a smooth transition into Chapter 11, with minimal disruptions to the Debtor's business. To prepare the Schedules and Statements, I understand that the Debtor must compile information from books, records, and documents maintained by the Debtor, relating to the claims, assets and contracts of the Debtor. Given the scope of the Debtor's operations, it will take substantial time to gather and process such information, a process that the Debtor anticipates will exceed the fourteen (14) days provided by the Bankruptcy Code and Bankruptcy Rules, when the Debtor and its professionals are working to stabilize business operations and effectuate the transition into Chapter 11. In light of the significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtor's professionals to assist in critical efforts to stabilize the Debtor's business and seek out and obtain post-petition financing and/or use of cash collateral, I believe an extension is necessary.

13.    Further, I believe the requested extension also will aid the Debtor in efficiently preparing accurate Schedules and Statements, as it will allow the Debtor to account for prepetition

5

invoices not yet received or entered into their accounting system as of the Petition Date and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary. As such, I believe the extension will benefit not only the Debtor, but all creditors and other parties in interest. Although the Debtor, with the assistance of its professional advisors, has begun to compile the information necessary for the Schedules and Statements, the Debtor has been consumed with a multitude of other legal, business, and administrative matters in the time leading up to the Petition Date. Nevertheless, recognizing the importance of the Schedules and Statements in this Chapter 11 Case, the Debtor intends to complete the Schedules and Statements as quickly as possible under the circumstances. Further, the Schedules and Statements will be filed well in advance of any deadline for filing proofs of claim in the Chapter 11 Case. Thus, all creditors will be afforded sufficient notice of the claim amounts scheduled by the Debtor.

14. In view of the amount of information that must be assembled and compiled, and the limited time available to do so, I believe that ample cause exists for the requested extension.

B. **Debtor's Emergency Motion for Entry of an Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

15. Pursuant to the Utilities Motion [ECF # 6], the Debtor seeks entry of an order: (i) approving the Debtor's proposed adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; and (iii) establishing procedures for determining adequate assurance of payment and resolving adequate assurance requests.

16. In connection with the operation of its business and management of its assets, the Debtor obtains Utility Services from a number of Utility Providers. A nonexclusive list of the

Utility Providers that provide Utility Services to the Debtor as of the Petition Date (the "Utilities Service List") is attached as Exhibit A to the Utilities Motion.

17. The Debtor spends an aggregate amount of approximately $1,165.00 per month on Utility Services from the Utility Providers. Most, if not all, of the Debtor's Utility Providers do not hold any deposits from the Debtor. As of the Petition Date, the Debtor owes approximately $747.92 on account of prepetition Utility Services. To the best of the Debtor's knowledge, there were no other defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.

18. The uninterrupted continuation of the Utility Services is critical to the Debtor's ongoing business operations throughout the course of the Chapter 11 Case. Should any of the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operation and primary revenue source would be jeopardized. Accordingly, I believe the Utilities Motion should be approved by the Court.

C. **Debtor's Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records (the "Cash Management Motion")**

19. Pursuant to the Cash Management Motion [ECF # 10], the Debtor seeks entry of an order authorizing the Debtor to: (a) continue to operate its cash management system and maintain its existing bank accounts, including honoring certain prepetition obligations related thereto; (b) maintain existing business forms; (c) continue the performance of their business transactions consistent with the Debtor's historical practices; and (d) waiving the guidelines (the "Guidelines") established by the U.S. Trustee related to cash management systems.

20. In the ordinary course of business, the Debtor uses and maintains certain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes,

promotional materials and other business forms related to their business operations (collectively, the "Business Forms"). Adopting a new set of Business Forms would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay. To minimize the administrative interruptions and expenses, the Debtor requests authority to continue to use its Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to the Debtor's status as "Debtor in Possession" in this Chapter 11 Case as required by the U.S. Trustee Guidelines.

21. The Debtor also maintains a cash management system (the "Cash Management System") in the ordinary course of business to gather, allocate, transfer, and disburse funds with respect to their operations and to facilitate cash monitoring and reporting. The Cash Management System is comprised of two (2) active bank accounts (the "Accounts") at PNC Bank and East West Bank. East West Bank is an authorized depository pursuant to the U.S. Trustee Guidelines, but PNC bank is not. As currently established, the Debtor's existing Accounts and Cash Management System function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtor and all parties in interest.

22. Given the nature of the Debtor's businesses, the uninterrupted use of the Debtor's Accounts is vital to its operations and overall Cash Management System and will facilitate the Debtor's transition into the Chapter 11 Case by minimizing delays in paying post-petition creditors and eliminating administrative inefficiencies. Moreover, maintaining the current Cash Management System on an interim basis will allow the Debtor's limited workforce to attend to their daily responsibilities rather than organize and administer a new system. Requiring the Debtor to adopt a new cash management system in the Chapter 11 Case would be costly, burdensome, and

disruptive to operations at this critical juncture, and could have a negative effect on the Debtor's ongoing restructuring efforts.

23. Finally, the Debtor seeks a waiver of the Guidelines established by the U.S. Trustee requiring that Chapter 11 debtors in possession, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish separate bank accounts for operations, payment of taxes, and cash collateral); and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

24. I believe that compliance with these requirements would create substantial and unnecessary administrative burdens, including additional expense, confusion among creditors, and diversion of scarce resources to the detriment of the Debtor as it transitions into this Chapter 11 Case. On the other hand, permitting the Debtor to maintain its existing Accounts and Cash Management System will prevent the disruption of operations and will not prejudice any party in interest. Further, because the Debtor presently maintains sophisticated, computerized accounting and record keeping systems related to its accounts and business operations, the Debtor will be able to ensure that all prepetition and post-petition transactions are properly accounted for and easily distinguished. The Debtor intends to continue to maintain complete and accurate records of all transfers of funds in and out of the Accounts. I therefore believe a waiver of the U.S. Trustee Guidelines is appropriate, as set forth in the Cash Management Motion.

**D.     Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Wages to Employees and (II) Granting Related Relief (the "<u>Employee Wage Motion</u>")**

25. Through the Employee Wage Motion [ECF # 5] the Debtor requests entry of an order: (i) authorizing, but not directing, the Debtor to (a) pay, in its sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable expenses, and

9

payroll service fees (collectively, the "Employee Obligations") and all costs related to the foregoing, and (b) maintain and continue to honor its practices, programs, and policies in place for the Employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (ii) authorizing and directing the Debtor's Banks to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations.

26. As set forth in the Employee Wage Motion, the Debtor has approximately eight salaried and contract employees in total (collectively, the "Employees"). The roles of Employees include the sales team, chemical technician, yard and delivery staff and other support staff. These Employees are vital to maintaining the value of the Debtor's estate as it transitions into the Chapter 11 Case, and the vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, Employees would be exposed to significant financial hardship if the Debtor was not permitted to continue paying their compensation, providing benefits, and maintain existing programs.

27. The Debtor utilizes the services of a professional employment organization, ADP Payroll ("ADP"), to process payroll, and employee benefit plans are administered separately, as more fully set forth in the Employee Wage Motion. The Debtor submits a net amount of money to ADP prior to the conclusion of each pay period, who then administers all of the Debtor's obligations incurred or related to wages, salaries, payroll taxes, and payroll service fees. Employees are paid bi-weekly via direct deposit from ADP. The Debtor's description of the payroll process and the amounts and other Employee Obligations due to the Employees as set forth in the Employee Wage Motion and Exhibit A thereto is accurate.

28. I believe that the relief requested in the Employee Wage Motion is in the best interest of the Debtor's estate and will enable the Debtor to continue to operate its business in the Chapter 11 Case without disruption so as to avoid immediate and irreparable harm to the estate. Accordingly, I believe the Court should grant the relief requested in the Employee Wage Motion and authorize the Debtor to honor the Employee Obligations, including those incurred prior to the Petition Date, and pay the Employees during the Chapter 11 Case.

**E. Debtor's Emergency Motion for Entry of an Order Authorizing Debtor to Continue Payments Pursuant to Insurance Premium Financing Agreement (the "Insurance Motion")**

29. Pursuant to the Insurance Motion [ECF # 9] the Debtor seeks entry of an order: (i) authorizing the Debtor to: (I) continue to pay Installments to First Insurance on a post-petition basis; and, (II) take all other necessary action to maintain coverage under the Financed Insurance Policies.

30. The Debtor maintains various insurance policies (collectively, the "Insurance Policies") in connection with its assets, employees and business operations. These Insurance Policies include general liability, property and equipment, automobile, health, workers compensation and umbrella. The Insurance Policies were each renewed and/or procured on or about May 10, 2025. Faced with cash liquidity issues, the Debtor determined that it would be more economically advantageous to finance the premiums on its general liability, commercial automobile liability and excess liability policies (the "Financed Insurance Policies"), rather than pay the entirety of the premiums up front on a lump-sum basis. On May 2, 2025, the Debtor entered into a Premium Financing Agreement ("PFA") with First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. ("First Insurance"). The terms of the PFA are more fully set forth in the Insurance Motion, which are true and correct to the best of my knowledge.

31. In light of the severe consequences should the Debtor's insurance policies lapse, the Debtor hereby requests authority from the Court to continue its practice of remitting monthly installment payments to First Insurance on a post-petition basis, as maintaining coverage under the Financed Insurance Policies is essential to the Debtor's continued operations, even though such Installments likely constitute payment of a prepetition claim.

32. The uninterrupted continuation of the Debtor's insurance policies is critical to the Debtor's ongoing business operations throughout the course of the Chapter 11 Case. Should the policies (and corresponding coverage) lapse, even for a brief period, the Debtor's business operation and primary revenue source would be jeopardized. Accordingly, I believe the Insurance Motion should be approved by the Court.

F. **Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Critical Vendors, and (II) Authorizing Banks to Honor All Related Checks and Electronic Payment Requests (the "<u>Critical Vendor Motion</u>")**

33. Pursuant to the Critical Vendor Motion [ECF #8] the Debtor seeks permission to make payments on certain prepetition Critical Vendor Claims in a manner, amount and time that is subject to the Debtor's' discretion, subject to the terms and conditions contained in any orders entered by this Court authorizing the use of cash collateral and any accompanying approved budgets.

34. I believe that the payment of the Critical Vendor Claims are vital to the Debtor's effort to reorganize its financial affairs in this Chapter 11 Case. In many instances, the Critical Vendors are the only source from which the Debtor can procure certain goods and services within a timeframe and at a price that will permit the Debtor to continue to efficiently operate their business. A failure to pay the Critical Vendor Claims would likely result in many of the Critical

Vendors refusing to provide goods and services to the Debtor post-petition and may force the Debtor to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtor's requirements.

35. I believe that, absent the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtor's immediate access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtor or may only do business if the Debtor provides onerous trade term accommodations such as advance deposits or payment prior to delivery. In light of the potentially severe consequences that would ensue if the Debtor was prohibited from paying certain Critical Vendors, I believe the relief requested in the Motion is in the best interests of the Debtor and the Debtor's bankruptcy estate and should be granted by the Court.

**G.     Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (V) Granting Related Relief (the "Cash Collateral Motion")**

36. The Cash Collateral Motion [ECF #11] is critical to the Debtor's success in this Chapter 11 Case, and without the Court granting the relief requested in the Cash Collateral Motion, each of the foregoing First Day Motions would be rendered moot. Pursuant to the Cash Collateral Motion, the Debtor seeks entry of interim and final orders approving the Debtor's use of cash collateral ("Cash Collateral") as working capital in the operation of their business for the purposes specified in, and at least for the period defined in, the budget (the "Budget") which is attached as Exhibit A to the Cash Collateral Motion. Specifically, the Debtor requests that the Court enter an order on an interim basis (the "Interim Order") authorizing use of Cash Collateral in accordance with the Budget, providing adequate protection for, and to the extent of, any diminution in value

of the Cash Collateral, and scheduling a final hearing (the "Final Hearing") for the Court to consider entry of a final order (the "Final Order") authorizing and approving the relief requested in the Cash Collateral Motion.

37. The use of Cash Collateral will ensure that the Debtor has continued access to remaining liquidity needed to maintain the minimal level of their ordinary course operations until such time as post-petition financing can be obtained to fund the duration of this Chapter 11 Case. The Debtor requires the use of Cash Collateral to make payments to Employees, Utility Providers, vendors and customers, among others, for purposes of conducting their operations and paying related expenses. Any failure to make those payments could cause substantial uncertainty and disruption to the Debtor's business.

38. Based on the financial forecasts and analysis conducted by Debtor's professionals and other advisors, the Debtor is unable to generate enough cash from operations in the ordinary course of business to cover their working capital needs in addition to the projected costs of this Chapter 11 Case. Therefore, the Debtor will have insufficient cash in the initial weeks of this Chapter 11 Case absent authority to use Cash Collateral. The use of Cash Collateral, with or without Bison's consent, will also send a positive, credible message to the Debtor's commercial counterparties and other parties in interest that the Debtor will be able to meet their ordinary course obligations and operate in this Chapter 11 Case as it moves forward with its restructuring efforts.

39. I believe the Debtor will face substantial and irreparable harm without the relief requested in the Cash Collateral Motion. Accordingly, I believe the Court should grant the relief requested in the Cash Collateral Motion and enter the Interim Order, and after the conclusion of the Final Hearing, the Final Order, authorizing the Debtor to use Cash Collateral in accordance with the Budget.

Signed on this the 12th day of August, 2025.

By: /s/ Darryl Wiebe
Darryl Wiebe
Chief Executive Officer
Iron Horse Chemicals, LLC

15