# Exhibit 9

## QUICK PAY AGREEMENT

This Quick Pay Agreement ("Agreement") is entered into _____6/26/2023_____ (the "Effective Date") between Bison Payments, a limited liability company organized and existing under the laws of the State of Oklahoma, ("Company"), and Swag Designs LLC, a corporation organized under the laws of the State of Texas ("Customer").  **This Agreement includes and incorporates the Application and the attached Quick Pay Supplement and contains, among other things, warranty disclaimers, liability limitations and use limitations**. There shall be no force or effect to any different terms of any related purchase order or similar form even if signed by the parties after the date hereof.

**1.      QUICK PAY**

1.1      The Customer may offer for sale to the Company one or more Receivables (as defined below) of the Customer arising from goods or services sold or rendered by the Customer to an Operator (as defined below) in the ordinary course of business. Each such offer to sell a Receivable offered for sale must be evidenced by an invoice (hereinafter collectively referred to as an "Invoice"), in form and substance acceptable to the Company, issued by the Customer to the applicable Operator. The terms "Receivable" and "Operator", respectively, have the meanings given to the terms "account" and "account debtor", respectively, in Article 9 of the Uniform Commercial Code. For the purposes here the term "operator" shall include the recipient of services or goods and to whom the Customer issues an invoice.

1.2      For each Receivable offered for sale to the Company under this Agreement, the Customer will deliver to the Company all supporting documentation and other information as the Company may from time to time request.  In the event the Customer offers to sell to the Company one Receivable or Invoice due from an Operator, the Customer must offer to sell the Company all Receivables and Invoices due from such Operator.  During the Term (as defined below), the Customer will not sell its Receivables to any person or entity other than the Company.

1.3      In the event of default, the Customer authorizes the Company to, at the election of the Company and without any obligation, submit to the Operator for payment all Invoices evidencing Receivables offered for sale by the Customer to the Company under this Agreement.  The Customer also irrevocably authorizes the Company to communicate with the Operator, in the name of the Customer or in the name of the Company, in order to verify, confirm and otherwise discuss such Receivables or Invoices.

1.4      The Company may elect to purchase a Receivable offered for sale to it under this Agreement by remitting to the Customer a down payment of the purchase price on or before the fifteenth (15th) business day following the date on which the applicable Operator accepts and confirms, in manner satisfactory to the Company, the related Invoice. The purchase price for a Receivable is the amount received by the Company, in immediately available funds, against payment of the Invoice for such Receivable. The down payment for a Receivable is an amount equal to the net amount of the Invoice evidencing such Receivable multiplied by the "advance percentage" set forth in the attached Quick Pay Supplement. The remaining balance of the purchase price for a Receivable (net of the down payment) will be paid by the Company to Customer on the next settlement date following receipt by Company, in immediately available funds, of payment in full of such Receivable. Settlement dates will be determined by the Company and will occur no less frequently than once every thirty (30) consecutive days. All Receivables purchased by the Company from Customer under this Agreement are purchased by the Company with full recourse to the Customer in the event the Receivable is not paid in full for any reason.  The Company has no obligation to purchase, or to accept any offer to sell, any Receivable of the Customer.

1.5      The Customer represents and warrants to the Company that each Receivable purchased by the Company from Customer hereunder (a) evidences an absolute, bona fide sale and delivery of goods or rendition of services by the Customer in the ordinary course of its business and such goods or services have been accepted by the Operator obligated thereon, (b) is genuine, valid and enforceable against the Operator obligated thereon in the full amount set forth on the Invoice evidencing such Receivable, without offset, defense, counterclaim, deduction, recoupment or contra account, (c) is not subject to dispute (real or alleged), (d) is legally saleable and assignable by Customer to the Company, (d) all documents delivered to the Company in connection with or in relation to such Receivable are genuine and valid, (e) is not such to any lien or security interest other than in favor of the Company and (f) shall not be altered or modified without the prior written consent of Company.

1.6      An outstanding Receivable purchased by the Company may be charged back to the Customer (a) if the Company has not received, in immediately available funds, payment in full of the Invoice evidencing such Receivable within 91 days from the date of such Invoice, (b) the Operator asserts or has any right of offset, dispute or defense to payment of such Receivable or the Invoice evidencing such Receivable, (c) if the Customer fails to pay when due any amount owed by Customer under this Agreement or in the event of any breach of any representation, warranty or covenant of Customer under this Agreement, (d) in the event Customer suspends or ceases operation of its business, (e) upon the commencement by or against the Customer or the Operator from whom such Receivable is due of a case or proceeding under any bankruptcy or insolvency law, or (f) upon any termination of this Agreement. In the event a Receivable is charged back to the Customer, the Customer shall remit to the Company, as the repurchase price for such Receivable, the down payment of the purchase price for such Receivable already paid by the Company to the Customer.  Upon receipt by the Company of the repurchase price for a Receivable charged back to the Customer, the Company will, in lieu of payment of the

7411507.2                                                                 1

purchase price for such Receivable, remit to the Customer all payments received by the Company, in immediately available funds, in respect of such Receivable. Upon request, Company will extend repayment date to 120 days from invoice approval. Such agreement may be made and documented in an email communication between the parties or their representatives.

1.7     The Customer will provide the Company with online access to all deposit accounts of the Company, including with such usernames and passwords as may be necessary or requested by the Company to effectuate such online access. The Customer will not open any new deposit account without giving the Company at least ten (10) days prior written notice.

1.8     Except as the Company may otherwise agree in writing, the Customer shall instruct and direct all Operators to remit all payments of Receivables to such bank account or lockbox as the Company may from time to time designate for such purpose.  In the event the Company, at the request of the Customer but at the discretion of the Company, agrees to designate a bank account or lockbox of the Customer for such purpose, the Company may rescind such agreement at any time and, in addition, may also condition such agreement on its receipt of a deposit account control agreement, in form and substance satisfactory to the Company, executed by the Customer and the financial institution at which such deposit account and/or lockbox is maintained.  Such instruction and direction to Operators shall be in form, manner and substance acceptable the Company, and the Customer authorizes the Company to send the same, at any time and from time to time in the name of the Company or Customer, including pursuant to a notice of assignment. The Customer will not amend, modify, alter or rescind any remittance or payment instructions sent to Operators by the Company or at its written direction. Upon inquiry from an Operator or upon Company's request from time to time, the Customer will notify its Operators to make payment of Receivables directly to or as directed by the Company.

1.9     In the event the Customer receives payment of a Receivable, the Customer will promptly deliver such payment to the Company in the same form received or, at the election of the Company, promptly deposit such payment into such bank account or lockbox as the Company may designate for such purpose. If a payment received by Customer on a Receivable is not so delivered to the Company (or, at the election of the Company, not so deposited into such bank account or lockbox designated by the Company) within ten (10) days of such receipt, or if the Customer deposits or negotiates such payment other than in accordance with this Section, the Customer shall, without limiting the obligation of Customer to immediately deliver the same to the Company, pay to the Company a fee equal to two percent (2%) of the amount of such payment if the Company believes such incident to be deliberate in their sole discretion.

1.10    Customer authorizes the Company to, in connection with the collection and administration of payments from Receivables, open all mail received by the Company with the Customer as addressee and endorse the Customer's name upon any notes, checks, acceptances, drafts, money orders and other forms of payment of Receivables.  This Section shall survive expiration or termination of this Agreement and shall continue in full force and effect until full and final payment of all existing and future obligations, indebtedness and liabilities of Customer to Company under this Agreement.

1.11    As security for all existing and future indebtedness, obligations and liabilities of the Customer under this Agreement, the Customer grants to the Company a continuing security interest in and lien upon all right, title and interest of the Customer in and to its existing and future Security as that term is defined in the attached Quick Pay Supplement.  Customer authorizes Company to file such financing statements with respect to the Security naming Company or its designee as the secured party and Customer as debtor. Customer hereby ratifies and approves all financing statements filed by or on behalf of the Company prior to the date hereof and ratifies and confirms the authorization of Company to file financing statements. Customer shall take all actions requested by Company from time to time to cause the attachment, perfection and, subject to any liens or security interests to which the Company may consent in writing, first priority of the Company's security interest in the Security. Without limiting the foregoing, Customer shall, at the request of Company with respect to each or any deposit account of Customer, deliver to the Company a deposit account control agreement, in form and substance satisfactory to the Company, duly executed by Customer and the financial institution at which such deposit account is maintained.  The Customer will not grant or permit to exist any security interest, lien or other encumbrance on or against the Security other than the security interest of the Company and such other security interests, liens or encumbrances to which the Company, in its discretion, consents in writing.

1.12    The Customer irrevocably authorizes the Company to (a) set off any amount (including any discount or other fee) due from the Customer to the Company under this Agreement against, or deduct or recoup any such amount from, any amount owing by the Company to the Customer hereunder (including any purchase price), (b) charge any amount (including any discount or other fee) due from the Customer to the Company under this Agreement to any account of the Customer with the Company, (c) initiate withdrawals from any deposit account of the Customer in order to pay when due any amount owed from the Customer to the Company under this Agreement and (d) apply or remit the proceeds of any purchase price to pay any amount due from Customer to Company under this Agreement or to perform any covenant or obligation of the Company under this Agreement.

2.      **PAYMENT OF FEES AND ACCOUNT STATED**

2.1     Customer will pay Company the then applicable fees (including discounts) described herein and in the attached Quick Pay Supplement (the "Quick Pay Fees").  Company reserves the right to change the Quick Pay Fees or applicable charges and to institute

new charges and Quick Pay Fees at the end of the Initial Service Term or then-current renewal term, upon thirty (30) days prior notice to Customer (which may be sent by email). Customer shall be responsible for all taxes associated with this Agreement and the transactions hereunder, other than U.S. taxes based on Company's net income.  If any provision of this Agreement is determined or found to require or constitute the payment of interest at a rate in excess of the maximum rate of interest permitted under applicable law, then such provision shall be deemed amended to provide for interest at said maximum rate, and any excess amount of interest paid shall, at the Company's option, either be applied as a payment of the amount of any obligation of the Customer to the Company which is not interest, in such order as the Company may determine, or be refunded by the Company to the Customer.

2.2         Each transaction appearing in a statement received by Customer from or on behalf of the Company in connection with this Agreement shall be subject to subsequent adjustment by the Company but shall, absent manifest error, be conclusively presumed correct and accurate and constitute an account stated between Customer and Company unless Customer delivers to the Company a written objection to such transaction, describing the error or errors allegedly contained therein, within sixty (60) days after the closing date of such statement reflecting such transaction. Inquiries by Customer should be directed to Company's customer support department.

3.     **ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS**

3.1         Customer hereby represents and warrants to Company, as of the date hereof and as of each day hereafter until this Agreement is terminated and all obligations of the Customer to the Company hereunder are repaid and satisfied in full, that the Customer (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified to do business and is in good standing in each jurisdiction where its ownership of property or the conduct of its business requires such qualification, (c) operates its business in material compliance with all applicable local, state and federal laws, (d) has all power and authority under the laws its jurisdiction of organization and its articles of organization to conduct its business and to enter into, execute and deliver this Agreement and to perform its obligations hereunder, (e) has taken all necessary action to authorize the execution and delivery of this Agreement the performance of its obligations hereunder and (f) is solvent, is able to pay its debts as they mature, has capital sufficient to carry on its business and all businesses in which it is about to engage and the fair saleable value of its assets (calculated on a going concern basis) is in excess of the amount of its liabilities.

3.2         Without giving the Company at least thirty (30) days prior written notice, Customer shall not change (a) its legal name, type of organization or jurisdiction of organization or (b) chief executive office, mailing address or any location of Security.  In addition, Customer shall give Company prompt notice of, but in any event within five (5) days after, any change in any of the officers, principals, partners or owners of Customer.

3.3         Customer shall not, at any time without advance warning to Bison, (a) be party to a merger or consolidation or acquire all or substantially all of the assets of, or equity interests in, any person or entity or any divisions of any person or entity, (b) incur or become liable for any indebtedness for borrowed money or obligations in connection with any merchant cash advance, except with the prior written consent of the Company, (c) sell or dispose of any Security other than the sale of any inventory in the ordinary course of business, (d) use the proceeds of any purchase price or other amount remitted by Company to Customer hereunder for any purpose other than for working capital purposes in the ordinary course of Customer's business, (e) conduct business or engage in any transaction with an affiliate of Customer except in the ordinary course of business upon fair and reasonable terms no less favorable to Customer than Customer would obtain in a comparable arm's length transaction with an unaffiliated person and, in all events, provided the same is fully disclosed to Company in writing in advance, (f) make loans or advances to any person or entity other than advances to employees for travel and entertainment expenses in the ordinary course of Customer's business, (g) engage in any business, other than its business as conducted on the date of this Agreement and any activities incidental thereto.

3.4         Customer shall permit Company to, inspect, audit and examine the books and records of Customer, make copies of the same, and inspect and appraise the Security and the other assets and properties of Customer in the event of default. Customer shall deliver to the Company such financial and other information concerning Customer, the Receivables, Invoices or Security as the Company may from time to time reasonably request.

3.5         Customer shall promptly, but in any event within five (5) days after Customer has knowledge of the same, notify Company of each dispute (real or alleged) concerning any Receivable or Invoice of Customer.  If any such dispute is not promptly settled by Customer, the Company may, at its election but without obligation, settle, compromise, adjust or otherwise dispose such dispute, whether by litigation or otherwise, at Customer's expense and upon such terms and conditions as Company in its discretion deems necessary or appropriate.  Customer shall promptly advise Company if Customer settles any dispute concerning a Receivable or Invoice, or grants any allowances, credits or adjustments to Originators.

3.6         Customer shall maintain, at its expense, insurance with respect to such risks, in such amounts and with such insurance companies as ordinarily are insured against by other entities engaged in the same or similar businesses as Customer.

4.     **TERM, TERMINATION AND EXCLUSIVITY**

4.1         This Agreement is for the Initial Service Term as specified in the Quick Pay Supplement and shall be automatically

renewed for additional periods of the same duration as the Initial Service Term (collectively, the "Term"), unless either party requests termination at least thirty (30) days prior to the end of the then-current term.

4.2    All sections of this Agreement which by their terms or nature should survive termination or expiration of this Agreement will survive termination or expiration, including, without limitation, accrued rights to payment, indemnification obligations, reimbursement obligations, confidentiality obligations, warranty disclaimers, and limitations of liability.

5.    **INDEMNITY.**

5.1    Customer indemnifies and holds harmless the Company and its officers, directors, shareholders, employees, representatives, success and assigns from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses of every kind and nature (including reasonable attorneys' costs, fees and expenses) which may be instituted or asserted against or incurred by any of such indemnified persons or entities with respect to the execution, delivery, enforcement, performance or administration of, or in any other way arising out of or relating to, this Agreement, and any actions or inactions with respect to any of the foregoing, provided the foregoing shall not apply to (a) any such indemnified liability that is determined pursuant to a final, non-appealable order issued by a court of competent jurisdiction to have resulted solely from such indemnified person's or entity's gross negligence or willful misconduct or (b) any third party liability subject to indemnification under the immediately preceding paragraph. This Section will survive termination or expiration of this Agreement.

6.    **LIMITATION OF LIABILITY.** NOTWITHSTANDING ANYTHING TO THE CONTRARY, EXCEPT FOR BODILY INJURY OF A PERSON, COMPANY AND ITS SUBSIDIARIES, AFFILIATED ENTITIES, SUPPLIERS (INCLUDING BUT NOT LIMITED TO ALL EQUIPMENT AND TECHNOLOGY SUPPLIERS), OFFICERS, REPRESENTATIVES, CONTRACTORS AND EMPLOYEES SHALL NOT BE RESPONSIBLE OR LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED THERETO UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY: (A) FOR ERROR OR INTERRUPTION OF USE OR FOR LOSS OR INACCURACY OR CORRUPTION OF DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY OR LOSS OF BUSINESS; (B) FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES; (C) FOR ANY MATTER BEYOND COMPANY'S REASONABLE CONTROL; OR (D) FOR ANY AMOUNTS THAT, TOGETHER WITH AMOUNTS ASSOCIATED WITH ALL OTHER CLAIMS, EXCEED THE QUICK PAY FEES PAID BY CUSTOMER TO COMPANY UNDER THIS AGREEMENT IN THE 12 MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY, IN EACH CASE, WHETHER OR NOT COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. COMPANY SHALL HAVE NO LIABILITY TO CUSTOMER FOR ANY LOSS OR FOR ANY FAILURE TO PERFORM ANY OBLIGATION HEREUNDER DUE TO CAUSES BEYOND ITS CONTROL INCLUDING WITHOUT LIMITATION INDUSTRIAL DISPUTES OF WHATEVER NATURE, POWER LOSS, TELECOMMUNICATIONS FAILURE, ACTS OF GOD, OR ANY OTHER CAUSE BEYOND ITS REASONABLE CONTROL.

7.    **REMEDIES.**  In the event of any failure of the Customer to pay when due any amount owed by Customer under this Agreement, any breach of any representation or warranty by Customer under this Agreement, any failure of Customer to perform, or any breach or default by Customer in the performance of, any covenant or agreement of Customer in this Agreement, any suspension or cessation of business or operations of the Customer, or the commencement by or against the Customer of any case or proceeding under the bankruptcy code or any other insolvency law, the Company shall have, in addition to all other rights and remedies under this Agreement or applicable law, the right to settle, compromise, sell or dispose of any Receivable or other Security. The net proceeds received by the Company from any such settlement, compromise, sale or other disposition will be applied by the Company to the obligations of the Customer to the Company under this Agreement and, after such application, the Customer shall remain liable to the Company for the remaining balance of the obligations and any deficiency in such obligations. Notwithstanding anything to the contrary herein, immediately upon the commencement by or against the Customer of any case or proceeding under the bankruptcy code or any other insolvency law, all indebtedness, liabilities and obligations of Customer to Company hereunder shall be automatically and immediately accelerated, without notice or further action of any kind. Customer waives any right to require Company to (a) proceed against any third party, (b) marshal assets or proceed against or exhaust any security from any third party, (c) perform any obligation of any Customer with respect to any Security and/or (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with the obligations of the Customer hereunder or any Security.  In addition, each natural person signing this Agreement as an owner, officer or other authorized representative of the Customer agrees that, by executing and delivering this Agreement, such person binds the Customer pursuant to the terms and conditions hereof and, in addition, such person agrees, in his or her individual capacity and not as an owner, officer or other authorized representative of the Customer, in the event of a breach or default by the Customer in the performance of its obligations hereunder, such person will promptly, upon the written request of the Company, remit to the Company for application to the obligations of the Customer to the Company hereunder an amount equal to the lesser of (i) the then outstanding obligations of the Customer to the Company hereunder and (ii) the aggregate amount of dividends, distributions and payments made by the Customer to such person or Customer (including any entity controlled by or under common control with such person or Customer) during the trailing six (6) month period immediately preceding such written request from the Company. The foregoing is an absolute, primary, unconditional, joint and several obligation of each such person, in his or her individual capacity, to the Company.

7411507.2

4

8. **MISCELLANEOUS.** If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable. This Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior written consent. Company may transfer and assign any of its rights and obligations under this Agreement without consent. This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement, and that all waivers and modifications must be in a writing signed by both parties, except as otherwise provided herein. No agency, partnership, joint venture, or employment is created as a result of this Agreement and Customer does not have any authority of any kind to bind Company in any respect whatsoever. Any amount due from the Customer under this Agreement that is not paid when due are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower. The Customer will reimburse and pay the Company for all fees, costs and expenses (including attorneys' fees and expenses) incurred by Company in connection with the preparation, execution, administration or enforcement of this Agreement, the filing or perfection of the security interest of the Company in the Security, obtaining or enforcing payment or performance of any obligation of the Customer to the Company, the prosecution or defense of any action or proceeding concerning any matter arising out of or connected with this Agreement, or any action or effort to inspect, verify, protect, collect, sell, liquidate or otherwise dispose of any Security. Customer will also pay to the Company its standard and customary fees relating to bank services, wire transfers, special or additional reports, remittance expenses (including, without limitation, incoming wire charges, currency conversion fees and stop payment fees), and other services at such rates as shall be charged by the Company to its clients from time to time. All such fees, costs and expenses shall be payable by the Customer to the Company upon demand by the Company. All notices under this Agreement will be in writing and will be deemed to have been duly given when received, if personally delivered; when receipt is electronically confirmed, if transmitted by facsimile or e-mail; the day after it is sent, if sent for next day delivery by recognized overnight delivery service; and upon receipt, if sent by certified or registered mail, return receipt requested. This Agreement shall be governed by the laws of the State of Oklahoma without regard to its conflict of laws provisions. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States or the courts of the State of Oklahoma in each case located in the city of Oklahoma City and County of Oklahoma County, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Company may use Customer's name and logo on Company promotional materials for the limited purpose of identifying Customer as a client of Company. Customer shall, at Company's request and Customer's expense, execute and deliver (or cause to be executed and delivered) to Company such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of Company to effectuate the provisions and purposes of this Agreement.

Bison Payments LLC

By: *Hailey Thomas*
— 41FB2E0DB54F441...

Hailey Thomas, President

Iron Horse Chemicals LLC

By: *Darryl Wiebe*
— 9E2428FB0234493...

Darryl Wiebe, President

QUICK PAY SUPPLEMENT

| | |
|---|---|
| Initial Service Term: | 12 months, commencing upon the Effective Date. |
| Advance Percentage: | 95% |
| Discount Fees | For each Receivable purchased by the Company, the Customer will pay to the Company an initial discount fee equal to 1.5% of the gross face amount of the related Invoice.<br><br>In the event the Company has not received, in immediately available funds, payment in full of the Receivable within 30 days of the date of the related Invoice, Customer will pay to the Company an additional discount fee equal to 1.5% of the gross face amount of the Invoice.<br><br>In the event the Company has not received, in immediately available funds, payment in full of the Receivable within 60 days of the date of the Invoice, Customer will pay to the Company an additional discount fee equal to 1.5% of the gross face amount of the Invoice.<br><br>In the event the Company has not received, in immediately available funds, payment in full of the Receivable within 90 days of the date of the Invoice, Customer will pay to the Company an additional discount fee equal to 1.5% of the gross face amount of the Invoice.<br><br>The discount fees above are fully earned at the time of purchase of the related Receivable. The initial discount fee for a Receivable is due and payable at the time of purchase. Each additional discount fee is due and payable at the earlier of payment in full of the Receivable or charge back of the Receivable. |
| Frequency of Offers: | Except as the Company may otherwise agree in writing, the Customer may submit offers to sell Receivables no more frequently than on a weekly basis. |
| Security: | All existing and future (a) accounts (including Receivables), (b) chattel paper, documents, books and records, general intangibles and supporting obligations, in each case, to the extent evidencing or relating to accounts, (c) all contract rights relating to accounts and (d) all proceeds of any of the foregoing including related deposit account, in each instance and to the extent applicable, as defined in Article 9 of the Uniform Commercial Code. |